STATE OF MINNESOTA                                   DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

Court File No.: _____

Mary L. Harnan

     Plaintiff,

vs.

**SUMMONS**

University of St. Thomas,

     Defendant.

THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to serve upon the attorneys for Plaintiff

an Answer to the Complaint which is hereby served upon you within twenty (20) days after

service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment

by default will be taken against you for the relief demanded in the Complaint.

Dated this 9th day of February, 2010                HALUNEN & ASSOCIATES

_Jon M. Thome_

Joni M. Thome, # 232087
1650 IDS Center
80 South Eighth Street, Suite 1650
Minneapolis, MN 55402
Telephone: 612.605.4098
Facsimile: 612.605.4099

*Attorneys for Plaintiff*


EXHIBIT
A

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

Court File No.: _____

Mary L. Harnan

    Plaintiff.

vs.

**COMPLAINT**

University of St. Thomas,

    Defendant.

The Plaintiff, Mary Harnan, for her Complaint against Defendant, states and alleges as follows:

## PARTIES

1. At all times relevant hereto, Plaintiff Mary Harnan ("Plaintiff") was employed by Defendant University of St. Thomas is a private university doing business in the State of Minnesota, County of Hennepin.

2. The acts alleged in this Complaint arise under the statutes and common law of Minnesota and fall within the general subject matter of this Court.

## FACTS

3. Plaintiff began working full time as a Coordinator II in the Center for Catholic Studies during August 2007 and was terminated within two days of being forced to return to work during a certified leave under the FMLA during August 2009.

4.    Plaintiff worked primarily as an assistant to and under the direction of Dr. Don Briel, Director of the department.

5.    Plaintiff enjoyed a good working relationship with Briel during her first year of employment. During late June 2008, Briel rated Plaintiff as a "successful" employee overall noting need for improvement in organization, control and decision-making. Briel commented that Plaintiff learned a lot in her first nine months and was adapting to her new job and its programs well. Plaintiff received a merit pay increase during the summer of 2008.

6.    After her performance review, Plaintiff had to take leave under the FMLA for surgery – Plaintiff had to have a hysterectomy. She told Laura Stierman about the reason for her leave request. Stierman advised Plaintiff to not let Briel know her reason for leave as he would view the surgery as a method of birth control and against the church.

7.    Plaintiff did not tell Briel directly but knew that Briel learned of her reason for leave as many of her co-workers talked freely and openly about Plaintiff's surgery.

8.    Plaintiff ultimately took six weeks leave, returned part time (with restrictions) but then had to take two more full weeks leave during August due to complications after the surgery.

9.    Upon her return to work full time, Plaintiff noticed that Briel's demeanor toward her had become dismissive, rude and short tempered. Briel had always been short in his answers to questions and noticeably rude to Plaintiff and other women, but his behavior toward Plaintiff worsened during the fall of 2008.

10.    Plaintiff reported to her mentor, Barbara Classen that Briel's behavior toward her had worsened since her return from leave. Plaintiff also told Classen that Briel was rude and dismissive toward other women in the department as well.

11.     Prior to her leave, Plaintiff routinely worked "off the clock" in effort to keep up with Briel's demands. This meant Plaintiff worked during her lunch breaks, arrived early and stayed late without receiving pay for those hours. Briel was well aware of the fact that Plaintiff worked "off the clock" without pay. Upon return from her leave, Plaintiff realized that she needed to take breaks and stick to the forty hour week she was paid to work.

12.     On or about January 6, 2009, Briel chastised Plaintiff for making some mistakes in her work. Later in the month, Briel gave Plaintiff a written statement referencing the conversation as a verbal warning.

13.     Around the same time, Plaintiff reported to Terry Sheehan, HR Partner for her department, that Briel's treatment of her was harsh, abrasive and demeaning. Plaintiff also reported that while Briel was critical of her work performance, he refused to engage in any conversation with her about how to improve her work performance. She told Sheehan that his conduct had become so abusive since she returned from leave in the fall that thought she might have to take a leave or look for work outside of her department.

14.     On or about January 23, 2009, Plaintiff sent an email to Briel indicating how she planned to prioritize her workload. Around this same time, Briel told Plaintiff that if he were her, "he would work off the clock and take things home on weekends and evenings to get them done." He did not otherwise respond to Plaintiff's plan.

15.     Plaintiff reported to Briel that she knew that other supervisors brought relatives and friends to work on weekends and in the evenings to work without pay just to catch up. She also reported that other employees worked "off the clock" all the time and that they would sometimes take "comp" time on some later date. Plaintiff told Briel that she knew the practice was not legal and that she would not violate the law.

16.     Throughout late January and in to February, Plaintiff took a proof reading class, asked Sheehan to assist with her work plan and engaged in regular meetings with Briel and Sheehan in effort to learn more about how Briel wanted her to prioritize her work.  Briel continued to resist any of Plaintiff's efforts to respond to his criticisms.  Briel continued to treat Plaintiff with disdain, dismissively and rudely.

17.     During early February, Plaintiff heard Briel speaking with another manager about a potential new hire for the Department.  Briel said, "isn't that the one who just had a baby?"  The manager responded, "yes."  Briel responded in a disapproving and demeaning tone, ..."and she is not done having babies yet."

18.     Plaintiff reported the comment to Classen.  Classen told Plaintiff that she knew Briel to be sexist and encouraged her to report the matter to HR.\

19.     During late February or early March, Plaintiff reported Briel's sexist comments to Sheehan.  At the same time, Plaintiff told Sheehan that the comment was just one example of how badly Briel treats and thinks about women.  Plaintiff told Sheehan that she treated her especially badly.  She went on to report that Briel expects women to remain subordinate and be at his beckon call.  Plaintiff reported that she had also heard Briel speaking disrespectfully about his new female manager – Briel referenced the woman and said that she "doesn't know what she is doing" and, "she is just a paper pusher."

20.     Sheehan never responded to Plaintiff's reports about Briel's sexist, hostile and discriminatory conduct.

21.     During late April, 2009, Plaintiff, Sheehan and Briel were meeting together when Briel directed Plaintiff to work "off the clock" in order to catch up with her work.  Plaintiff

complained to Briel and to Sheehan that working "off the clock" was in violation of her rights and that she would not do it.

22.     Around the same time, Plaintiff was working with planning and preparation for an annual conference. She was commended for her work by several managers and co-workers but not by Briel.

23.     Still receiving no positive feedback from Briel and still being berated and chastised for making mistakes about matters that were not within her job duties, Plaintiff solicited a meeting with Edna Comedy, HR Director during late May 2009.

24.     Plaintiff reported to Comedy that Briel had been directing her to work off the clock and that he berated her for not doing so. Comedy's response was, "maybe he forgot that you are not an hourly employee."

25.     Plaintiff also reported to Comedy that Briel was a sexist man who treated women, especially her, badly. She provided Comedy with some examples of Briel's conduct and comments including the negative comments about pregnant women. Plaintiff also reported to Comedy that some managers were having people bring food from home for University events and that she knew the practice was a law violation and opened the school to liability. She also reported to Briel and to Comedy that the Catholic Studies Housing were overbooked with students which was a violation of housing codes.

26.     Comedy became visibly anxious during the conversation and began searching Defendant's system for job postings for jobs Plaintiff could transfer to. Comedy did not take notes, on information and belief, did not make any investigation in to Plaintiff's complaints. Comedy told Plaintiff that she needed to tell Briel that he bothered her. Plaintiff told Comedy that she had already reported his conduct and tried to complain to him directly but that Briel told

her that "it was not about feelings, it is about the job." Comedy's response was, "no that's not right, it's about both."

27.    During June 2009, Plaintiff reported to Briel that Father Keating was having books copied at Kinko's without pulling copyrights for the books.

28.    After making the report about copyright violations and the reports to Comedy, Briel treated Plaintiff with even more hostility. He yelled at her during meetings and in front of her co-workers, other managers and in front of Sheehan. Plaintiff was experiencing severe headaches, migraines, sleeplessness, anxiety and was feeling depressed as a result of the abusive treatment from Briel.

29.    In early July, Briel gave Plaintiff her annual performance review. The review was negative. Plaintiff disagreed with the comments and examples of "mistakes" Briel alleged Plaintiff made over the course of the year. Briel essentially repeatedly complained and noted the same few mistakes over and over again. Plaintiff was upset by the review, told Briel she disagreed and refused to sign the review to acknowledge acceptance of the criticisms.

30.    Within a few days after receiving the review, Plaintiff's physical and mental condition became so alarming to her, she sought medical attention and ultimately requested FMLA as her doctor recommended she take a leave from work.

31.    Plaintiff provided Defendant with all required information about her need for leave and complied with all policies and processes required for the leave. Defendant approved Plaintiff's FMLA but at the same time lead Plaintiff to believe that she was required to apply for Short Term Disability for the time period and that she was required to see a doctor designated by Defendant.

32.     Plaintiff attended the medical examination as directed on August 11, 2009.
Plaintiff was concerned about providing medical information and releases to the doctor as she
feared Briel would learn of her problems with anxiety, depression and other symptoms of stress
related to the abusive, retaliatory and discriminatory conduct of Briel, Sheehan and Comedy.

33.     Plaintiff's FMLA leave was to run from July 17, 2009 until the date her doctor
recommended she return to work – August 24, 2009. As such, on or about August 17th Plaintiff
contacted Sheehan and requested she meet with her to discuss concerns she had about her
impending return to work. She also let Sheehan know that she would be seeing her doctor on
August 20th but did think she would return to work on the 24th as planned.

24.     Throughout the course of her leave, Plaintiff's co-workers and managers
contacted her several times with questions. Plaintiff responded accordingly.

25.     Sheehan did not respond to Plaintiff's request for a meeting before her return to
work but told her that they could meet on August 24th. On August 19th Plaintiff received a phone
call from Benefits Specialist, Stephanie Monogue. Monogue told Plaintiff that the doctor she
saw at Defendant's direction on August 11th had determined that Plaintiff was not eligible for
Short Term Disability and that she was not "disabled but rather medically able to perform the
essential functions of your job without any restrictions." Monogue told Plaintiff over the phone
and again by letter that the doctor recommended she "return to work immediately." Monogue
directed Plaintiff to return to work the next day at 8:00 a.m.

26.     Plaintiff explained that she was on an FMLA leave, not STD and that she had a
doctor appointment scheduled for the very next day. Monogue told Plaintiff she should contact
Briel about the doctor appointment. Plaintiff then sent an email and an appointment note to Briel

and Sheehan noting her doctor appointment the morning of the 20th. Briel told Plaintiff that he did not think the matter was negotiable

27.    Plaintiff arrived at work before 8:00 a.m. on the 20th. She was almost immediately called in to a meeting with Briel and Sheehan. During the meeting, Briel and Sheehan told Plaintiff verbally and in writing that if her performance did not improve, she would be terminated.

28.    Plaintiff left the meeting feeling upset but she continued her work duties until it was time for her to leave for her doctor appointment. About an hour after the meeting, Plaintiff told her co-workers she would be back to work after her doctor appointment.

29.    Plaintiff attended the appointment and returned to work for the rest of the day. Plaintiff worked the next day and engaged in her regular work duties which included several contacts with Briel.

30.    On the 21st of August, Plaintiff told Sheehan verbally and then via email that she believed she was being treated unfairly when she was "written up" while she was on FMLA, that she had been called back to work while she was on FMLA.

31.    By email dated August 21, 2009, Plaintiff complained to Sheehan about several things including the following: directives to work off the clock and retaliation for refusing to do so; copyright infringement and retaliation for reporting; housing code violations and retaliation for making the report to Briel; failure to report accurate numbers for student housing and violation of housing codes – retaliation for reporting the same to Briel and others; made reports of discrimination based on sex with no response and retaliation for making the reports.

32.    Plaintiff reported to work as usual on August 24, 2009. Plaintiff was called to Briel's office and was terminated for "insubordination."

33.     Despite the sexist and retaliatory nature of Briel, Plaintiff was devastated by the termination. As Plaintiff sat crying in her car parked at a park she recalled the advice one manager gave her about working at St. Thomas, "It's a big boys club. Just don't let them see you cry, that is what they want." That same manager also said, "I would like to work with more women but, as long as Don is there, no women will come work here."

34.     As a direct and proximate result of Defendant's illegal conduct, Plaintiff was subjected to a hostile, retaliatory and discriminatory work environment and was discharged from her employment. She has suffered, and will continue to suffer, severe emotional distress, embarrassment, humiliation, loss of self esteem, loss of reputation, loss of sleep and loss of appetite. Plaintiff has been prevented from obtaining the full enjoyment of life, has sustained loss of earnings, benefits and earning capacity, has incurred and will continue to incur other related damages. Plaintiff has also incurred attorney's fees and expenses and other serious damages.

## COUNT I
## REPRISAL DISCRIMINATION UNDER THE
## MINNESOTA HUMAN RIGHTS ACT

Plaintiff re-alleges each and every paragraph of this Complaint.

35.  Defendant, through its managers and employees acting on behalf of Defendant and within the scope of their employment in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 et seq. These practices included, but are not limited to retaliating against Plaintiff for raising complaints of discrimination, retaliation and harassment based on sex in violation of the MHRA to Defendant.

36. As a result of Defendants' illegal actions, Plaintiff has suffered from distress, humiliation and embarrassment, loss of reputation, loss of enjoyment of life, lost income, has incurred attorney's fees and expenses and other serious damages.

37. As a result of Defendants' illegal actions, Plaintiff was made to work in a hostile, discriminatory and retaliatory environment and suffered adverse employment actions including being discharged from her employment.

## COUNT II
## VIOLATIONS OF
## THE FAMILY AND MEDICAL LEAVE ACT

Plaintiff re-alleges each and every paragraph of this Complaint.

38. Defendant engaged in unlawful employment practices involving Plaintiff in violation of the Family Medical Leave Act, 29 U.S.C. sec. 2601 *et. seq*. These practices include, but are not limited to, altering the terms and conditions of her employment, denying FMLA, interfering with her leave under the Act and harassing her because she asserted her rights under the Act and terminating her employment while she was on leave.

39. Plaintiff was retaliated against in the terms, conditions and privileges of her employment after she exercised her rights under the Family Medical Leave Act.

40. The unlawful employment practices complained above were intentional and were performed by Defendant with malice or reckless indifference to anti-discrimination and retaliation laws which protect Plaintiff.

41. As a result of Defendants' illegal actions, Plaintiff has suffered from distress, humiliation and embarrassment, loss of reputation, loss of enjoyment of life, lost income, has incurred attorney's fees and expenses and other serious damages.

## COUNT III

### VIOLATIONS OF THE MINNESOTA WHISTLEBLOWERS ACT
Plaintiff realleges each and every paragraph of this Complaint.

42.    Plaintiff, in good faith, reported what she believed to be violations of law.

Defendant retaliated against Plaintiff as a result of her reports by subjecting her to adverse

actions including terminating her employment.

43.    The adverse employment actions as alleged herein constitute violations of Minn.

Stat. §181.932 *et. seq.*

44.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered,

and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering,

loss of wages and benefits and other serious damages.

## COUNT IV
### GENDER DISCRIMINATION IN VIOLATION
### OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff realleges each and every paragraph of this Complaint.

45.    Defendant  engaged in unlawful employment practices involving Plaintiff based

upon her gender in violation of the Minnesota Human Rights Act, Minn. Stat. Sec. 363A.01

*et. seq.*

46.    The effect of the practices complained of above has been to deprive Plaintiff of

equal employment opportunities and otherwise adversely affect her status as an employee

because of her gender.

47.     The unlawful employment practices complained above were intentional and were performed by Defendant with malice or with reckless indifference to anti-discrimination laws which protect the Plaintiff.

48.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits and other serious damages.

n, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages.


**WHEREFORE**, Plaintiff respectfully prays:

a.     That the practices of Defendant complained of herein be adjudged, decreed, and declared to be a violation of the rights secured to Plaintiff by state law.

b.     That Defendant be required to make Plaintiff whole for its adverse, discriminatory actions through restitution in the form of back pay, with interest of an appropriate inflation factor.

c.     That a permanent prohibitory injunction be issued prohibiting Defendant from engaging in the practices complained of herein.

d.     That Plaintiff be awarded compensatory damages in an amount to be established at trial.

e.     That Plaintiff be reinstated to her job or, in the alternative, be awarded front pay and monetary value of any employment benefits she would have been entitled as an employee for Defendant.

f.     The Plaintiff be awarded compensatory damages in an amount in excess of $50,000.00 as established at trial.

g.     That the Court award Plaintiff her attorney's fees, costs and disbursements pursuant to state statute.

h.     That the Court grant such other and further relief as it deems fair and equitable.

## PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS

Dated this 9 day of February 2010

HALUNEN & ASSOCIATES

Joni M. Thome, Atty. No. 232087
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: 612.605.4099

# EXHIBIT B

### Known Counsel of Record

| | |
|---|---|
| Joni M. Thome, Esq. #232087<br>HALUNEN & ASSOCIATES<br>80 South Eighth Street<br>Suite 1650<br>Minneapolis, Minnesota 55402<br>Telephone: (612) 605-4098<br><br>**Attorneys for Plaintiff Mary L. Harnan** | Phyllis Karasov #53788<br>Martin Kappenman #320596<br>Of MOORE, COSTELLO & HART, PLLP<br>55 East Fifth Street, Suite 1400<br>St. Paul, Minnesota 55101-1792<br>Telephone: (651) 227-7683<br><br>**Attorneys for Defendant University of St. Thomas** |

